UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
BUTERA & ANDREWS,                         )
                                          )
       Plaintiff,                         )
                                          )
       v.                                 )   Case No. 1:06CV00647 (RBW)
                                          )
INTERNATIONAL BUSINESS MACHINES            )
CORPORATION, *et al.*,                    )
                                          )
       Defendants.                        )
_____)

**DEFENDANT IBM'S CONSOLIDATED REPLY IN SUPPORT OF ITS MOTION
TO DISMISS FOR FAILURE TO STATE A CLAIM AND OPPOSITION TO
PLAINTIFF'S CROSS MOTION FOR LIMITED EXPEDITED DISCOVERY**

      Plaintiff's Complaint must be dismissed because it did not allege -- and cannot, consistent with Rule 11 obligations, be amended to allege -- that IBM violated the Computer Fraud and Abuse Act ("CFAA"), the Stored Wire and Electronic Communications Act ("SWECA") or the Federal Wiretap Act ("FWA").  Plaintiff apparently concedes that each one of these statutes requires intentional conduct by the defendant.  Yet nowhere in the Complaint is there any allegation that IBM knew about or authorized the as-yet-unidentified "hacker" to attempt to penetrate Plaintiff's e-mail server, or any allegation that IBM had any conceivable benefit to be gained from such conduct.  Plaintiff cannot state a claim merely by alleging that certain events are "tied" to IP addresses registered to IBM, particularly when Plaintiff's own Complaint concedes that IBM is engaged in the business of providing computer services -- including IP addresses -- to third party customers.  Indeed, Plaintiff's argument would be akin to holding AOL liable for intentional misconduct any time an IP address registered to AOL is used by a

hacker to engage in unauthorized conduct. There is no precedent for applying the law so broadly, and Plaintiff cites none.

Plaintiff cannot avoid dismissal by arguing that it needs discovery to determine whether or not it has any claims against IBM. This kind of shoot-first-and-ask-questions-later approach to pleading is plainly prohibited by the Federal Rules and it is inconsistent with the very precedents on which Plaintiff relies. Plaintiff acknowledges in its Complaint that it does not know who attempted to hack into its e-mail server. This admission alone establishes the lack of any good faith basis for asserting a claim for intentional misconduct against IBM. While Plaintiff may need limited discovery from IBM to assist it in identifying the potential culprits, the appropriate way to get that discovery is not by initiating a frivolous lawsuit against IBM that is not justified by either the facts or the law. The proper course would have been that followed in *Physicians Interactive* and *Alvis Coatings* -- both of which are cases relied on by Plaintiff. *Physicians Interactive v. Lathian Sys.*, No. CA 03-1193-A, 2003 WL 23018270 (E.D.Va. Dec. 5, 2003) (Opp. at 12-13); *Alvis Coatings, Inc. v. John Does One through Ten*, No. 3L94 CV 374-H, 2004 WL 2904405 (W.D.N.C. Dec. 2, 2004) (Opp. at 13-14). There, plaintiffs sued "John Doe Defendants" for hacking into their systems and issued third party subpoenas to the registered holders of the IP addresses to determine the identity of the customers who had used those addresses. Plaintiffs in those cases did not pretend -- and the courts certainly did not find -- that mere registration provided any legal grounds for asserting an intentional tort claim against the address holder. Nor does it suffice here. The Complaint should be dismissed with prejudice.

I.  **PLAINTIFF HAS NOT PLED AND CANNOT PLEAD INTENTIONAL CONDUCT ON THE PART OF IBM.**

   A.  **Plaintiff Fails to Allege Intentional Conduct, Which Is an Essential Element of Its Claims.**

In its opening brief, IBM demonstrated that, by their plain terms, the statutes under which Plaintiff has brought suit require "intentional" conduct in order for liability to attach. Memorandum of Law in Support of Motion to Dismiss (June 2, 2006) ("Mem.") at 5-6. IBM further demonstrated that federal courts that have considered the question have interpreted the term "intentional" quite narrowly, requiring that the complained-of conduct or result be the defendant's "conscious objective." *In re Pharmatrak, Inc. Privacy Litig.*, 329 F. 3d 9, 23 (1st Cir. 2003). Mem. at 6. IBM then demonstrated that Plaintiff had not pled any intentional conduct on the part of IBM, but instead had made allegations that, at best, permitted an inference that an unknown employee engaged in unauthorized conduct without the knowledge of IBM. Mem. at 6-7.

Plaintiff apparently concedes that the statutes in question require intentional conduct, and that the *mens rea* requirement is a high one, yet they attempt to distinguish *Pharmatrak* and the other authorities cited by IBM by observing that they were resolved at the summary judgment stage. Opposition to Motion to Dismiss and Cross Motion for Limited Expedited Discovery (June 16, 2006) ("Opp.") at 11-12. Plaintiff misses the point. The issue is not whether Plaintiff can *prove* intentional conduct at this stage, but rather whether it has even alleged the essential elements of its claim. These statutes do not permit claims based on negligence or strict liability, and they certainly do not permit a private civil action against holders of registered IP addresses (particularly giant information technology companies such as IBM, which has millions of

registered IP addresses)[1] just because a hacker uses such IP addresses to commit "attacks" on a computer. Even assuming every allegation in Plaintiff's Complaint were true, therefore, it would not establish any claim for relief.

Plaintiff's opposition does not pretend that the Complaint asserts intentional conduct by IBM. Nor does it address IBM's showing that the Complaint's allegations are inconsistent with intentional conduct in that they allege a failure by IBM to prevent unauthorized conduct by its employees. Cplt. ¶ 14; Mem. at 7. Plaintiff clearly understands how to plead intentional conduct, as it repeatedly alleges that defendant John Doe "initiated, directed, and managed this attack." Cplt. ¶¶ 11, 12, 13. Plaintiff makes no such allegations against IBM and, in fact, even in its brief, goes no further than to assert that "IBM *assets* initiated these attacks." Opp. at 6 (emphasis added). This allegation falls far short of asserting that IBM had the requisite "conscious objective" to attack Plaintiff's e-mail server.

### B. No Inference of Intentional Conduct Can Reasonably Be Drawn From Plaintiff's Complaint.

Lacking any express allegation of intentional acts by IBM, Plaintiff attempts to manufacture an *inference* of intentional conduct from what it refers to in its brief as the "persistent and exclusive presence of IBM registered IP addresses in the attacks as outlined in the complaint." Opp. at 1; *see also* Opp. at 4, 5, 6, 8, 15. But the Complaint contains no mention of the purported "exclusive presence" of IBM-registered IP addresses,[2] and the

---

[1] Plaintiff refers the Court to the "WHOIS database" maintained by the American Registry for Internet Numbers ("ARIN") as the basis for its claim that IBM is the registered owner of the particular IP addresses they cite. Opp. at 8, n.6. The same query (attached as Ex. A) indicates that IBM has registered the entire range of IP addresses from 170.224.0.0 to 170.227.255.255 -- a total of more than a quarter million addresses. This is only a tiny portion of the "blocks" of internet protocol addresses that are registered to IBM.

[2] The complaint controls for purposes of a motion to dismiss and a plaintiff cannot introduce new "allegations" in its opposition brief. *See*, *e.g.*, *Tiefenbacher v. American Ass'n of Retired Persons*, No. Civ.A. No. 05-1802, 2006 WL 1126841, at *2 (D.D.C. April 27, 2006) (granting motion to dismiss) (attached as Ex. B); *Stewart v. Nat'l Educ. Ass'n*, 404 F. Supp. 2d 122, 129-30 (D.D.C. 2005) (same).

suggestion that there was any real "pattern" of attacks or that IBM-registered addresses were the sole source of purported "attacks" on Plaintiff's e-mail server is contradicted by the Complaint.[3]

In fact, the Complaint and brief together make clear that the first -- and only -- event allegedly directed at Plaintiff through an IBM-registered IP address occurred on November 8, 2005. Cplt. ¶ 11; Opp. at 3. Plaintiff's security consultant had earlier been retained by Plaintiff to do a security review because, as the Complaint states, "[i]n or about October or November of 2005, a member of the law firm became aware of facts which suggested that the e-mail server which the firm operated had been compromised by unauthorized parties." Cplt. ¶ 7. The Complaint further alleges that an unknown hacker had placed a series of computer code instructions in the e-mail server that allowed it to enter the system surreptitiously on multiple occasions. Cplt. ¶ 9. Plaintiff does not claim, either in the Complaint or even in its opposition, that any of these earlier events had anything to do with IBM. It does not claim that anyone associated with IBM "placed" the code in the server or surreptitiously entered its systems. Indeed, the Complaint alleges only a single event that was directed at Plaintiff's e-mail server through a single IBM-registered IP address: an *unsuccessful* attempt on November 8 to "sync up" with Plaintiff's e-mail server.[4] Cplt. ¶¶ 11, 16, 18, 20.

Unable to establish a "pattern" from a single event, Plaintiff resorts to events that were allegedly directed not at Plaintiff but at the computer systems of third parties. Plaintiff contends that a computer used by its security consultant experienced "denial of service" attacks that came from two IP addresses registered to IBM. Although the Complaint does not identify the dates or

---

[3] Plaintiff's opposition refers to discussions with IBM that occurred prior to and after the filing of the lawsuit (Opp. at 2). Plaintiff fails to mention, however, that it admitted during those discussions that attacks had been made on its e-mail server by IP addresses having nothing to do with IBM.

[4] Plaintiff's brief confirms that the November 8 event is the first of the three "significant events" that provide the basis for the Complaint. Opp. at 3.

IP addresses, Plaintiff's opposition claims these events occurred on November 12 and 13, 2005, and it lists two IP addresses that are -- if they were involved in these events at all and not spoofed by an outsider -- assigned to route optimization devices in Miami. Because route optimization devices perform routine networking functions that do not constitute intrusions or attacks, Plaintiff had previously agreed to exclude IP addresses associated with such devices from preliminary discovery discussions.[5]

The real bootstrapping, however, comes with Plaintiff's attempt to derive some inference of intentional IBM conduct *aimed at Plaintiff* from scanning activity that they claim occurred over a 12-month period involving a *client's* computer systems. Plaintiff does not identify the client or explain why it is reasonable to infer that scanning activity aimed at this particular client -- out of the many clients whose logs its security consultant apparently reviewed (Opp. at 4) -- has any relevance to either the identity or the motive of the alleged hacker who unsuccessfully sought access to Plaintiff's server on November 8.

Particularly disingenuous is Plaintiff's suggestion in its brief -- but not found in its Complaint -- that the 40,167 "events" constitute a "pattern" that exclusively involves IBM-registered addresses. Opp. at 1, 4, 6. In fact, like a Texas sharp-shooter, Plaintiff apparently identified all events experienced by the client over a period of a year that involved any of the millions of IP addresses registered to IBM, drew a circle around it, and called it a "pattern." The "pattern" exclusively includes IBM-registered IP addresses only because Plaintiff arbitrarily

---

[5] Route control devices allow network managers to optimize the company's ISP connectivity. Network World, Encyclopedia "Route Control," http://www.networkworld.com/details/536.html?def (attached as Ex. C). Such devices send out a series of traceroute commands in order to determine improved paths for communications to and from different IP addresses. These commands likely would have been automatically generated in response to the electronic "footprints" that Plaintiff claims its security consultant created. Opp. at 4. This is normal activity that does not in any way "attack" or compromise the integrity of the computer system. As discussed in more detail below, in connection with IBM's voluntary agreement to begin contacting its customers to whom the IP addresses in question have been assigned, Plaintiff agreed that IP addresses associated with route optimizers may be excluded. (Correspondence attached as Ex. D.)

decided not to include any other events. It should come as no surprise that, as Plaintiff acknowledges in its brief (Opp. at 4), the client's IT personnel -- those most familiar with the usual patterns of activity on the client's server -- did not recognize this activity as unusual, much less as constituting an "organized attack," until 11 months after it began, and only reached that alleged conclusion after receiving Plaintiff's gerrymandered analysis.[6]

Aside from this non-existent "exclusive pattern," Plaintiff claims that an inference of intentional conduct can be drawn merely from the fact that IBM employees had the technical expertise to engage in hacking and might still have had some degree of access to some of its customers' servers. Opp. at 5-8. As shown below, Plaintiff's speculation that an IBM employee would be a likely candidate to engage in these activities is illogical and uninformed, but it is in any event legally irrelevant. An employee's intentional torts cannot be imputed to his employer simply because the employee had "access" or "opportunity" to commit a tort while on the job. *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995) ("It is not enough that an employee's job provides an 'opportunity' to commit an intentional tort.").

Plaintiff's hunches about who might or might not be the unknown hacker are, in any event, based on unpled facts and baseless assumptions. It argues, for example, that the attacks might be the work of an IBM employee because it would be "much easier [for] a person on the inside . . . who can simply walk down the hallway at Durham . . . ." Opp. at 5. Yet Plaintiff acknowledges, inconsistently, that the servers may be located at server farms in places other than Durham. Opp. at 6. Plaintiff suggests in its brief (but does not allege in its Complaint) that the "attacks" were unusually "sophisticated," thus requiring a high level of expertise, and yet it

---

[6] It is worth noting that the anonymous client has not filed a lawsuit against IBM or otherwise taken any action suggesting that it viewed the "activity" as an intentional attack by IBM on its systems.

admits that the single attempt to penetrate Plaintiff's server was a failure.[7] Opp. at 4-5. They argue that "it should be obvious that no computer hacker would utilize a machine or IP address which is registered directly to him," but then ask the Court to infer that *IBM* would use its own IP-registered addresses to unlawfully hack into a computer (or equally ludicrous, that a sophisticated IBM technician would choose to "hide" his hacking activity behind IP addresses he knew to be registered to IBM). Opp. at 7.

All of these arguments are based on the false premise that hacking or "spoofing" of IP addresses is difficult to accomplish or requires "insider access." According to the Internet Assigned Names Authority:

> It is quite possible that an IP address in an e-mail header could be fabricated. E-mail protocols are not secure and *anyone with the minor technical skills necessary* can forge any part of an e-mail. . . . The IANA cannot locate the individuals who forge e-mail headers. In fact, return addresses can be spoofed right down to the packet level. (Just like in postal mail, one can put pretty much anything as a return address, . . . .) IP addresses can be spoofed in protocols other than e-mail, as well.

Internet Assigned Numbers Authority, Abuse Issues and IP Addresses, http://www.iana.org/faqs/abuse-faq.htm (attached as Ex. F)(emphasis added).[8] When one adds

---

[7] Nor does it require a high degree of sophistication to conduct the "scans" allegedly directed at the client's computer. Opp. at 4. As explained in The Froehlich/Kent Encyclopedia of Telecommunications (v. 15, 231-55)(1977), http://www.sei.cmu.edu/news-at-sei/features/1998/dec/background-dec98.htm (attached as Ex. E): "As in many areas of computing, the tools used by intruders have become more automated, allowing intruders to gather information about thousands of Internet hosts quickly and with minimum effort. . . . The increased availability and usability of scanning tools means that even technically naïve, would-be intruders can find new sites and particular vulnerabilities."

[8] Similarly, as The Froehlich/Kent Encyclopedia confirms (Ex. E), the range of individuals with the ability to engage in unauthorized computer activity is enormous:

> It is remarkably easy to gain unauthorized access to information in an insecure networked environment, and it is hard to catch the intruders.
>
>         *        *        *
>
> It is difficult to characterize the people who cause incidents. An intruder may be an adolescent who is curious about what he or she can do on the Internet, a college student who has created a new software tool, an individual seeking

to the mix the facts that IP address registrations are publicly available, that there were attacks here that originated from addresses not registered to IBM, and that spoofing does not require any access to the registrant's internal systems, it is not even plausible to infer that these events were likely committed by someone associated with IBM.

But even accepting Plaintiff's implausible inference that an IBM employee was involved, Plaintiff's arguments contradict any inference that IBM authorized or directed his conduct. For example, Plaintiff argues that it is reasonable to suspect a "person on the inside who does not have to circumvent IBM's external firewalls and security," thus acknowledging that any employee who engaged in such conduct would necessarily have sought to avoid detection by IBM. Opp. at 5. Likewise, as pointed out in IBM's Memorandum, the Complaint alleges a failure to adopt policies that would prevent *unauthorized* access to customer servers. Cplt. ¶ 14. These allegations and arguments are inconsistent with, and contradict, the inference of "intentional conduct" that Plaintiff would have the Court draw.

---

(continued…)

> personal gain, or a paid "spy" seeking information for the economic advantage of a corporation or foreign country. An incident may also be caused by a disgruntled former employee or a consultant who gained network information while working with a company. An intruder may seek entertainment, intellectual challenge, a sense of power, political attention, or financial gain.
>
> \*          \*          \*
>
> As intruders become more sophisticated, they identify new and increasingly complex methods of attack. . . . Other tools are used to construct packets with forged addresses; one use of these tools is to mount a denial-of-service attack in a way that obscures the source of the attack. Intruders also "spoof" computer addresses, masking their real identity and successfully making connections that would not otherwise be permitted.
>
> \*          \*          \*
>
> Because of the inherent openness of the Internet and the original design of the protocols, Internet attacks in general are quick, easy, inexpensive, and may be hard to detect or trace. An attacker does not have to be physically present to carry out the attack. In fact, many attacks can be launched readily from anywhere in the world -- and the location of the attacker can easily be hidden.

For all the speculation in its brief about who may or may not have had the access or knowledge to conduct an "attack," Plaintiff is remarkably silent -- both in the Complaint and in its brief -- on the critical question of what possible motive IBM might have to engage in these alleged attacks. As the First Circuit has observed, for purposes of establishing "intentional" conduct under the CFAA, an act is much more likely to be considered intentional "when it serves a party's self-interest to engage in such conduct." *Pharmatrak*, 329 F. 3d at 23. Plaintiff does not even try to explain why IBM would attempt to hack into the server of a random law firm with which it has no prior or existing business or other relationship.

On a motion to dismiss, the Court is not required to accept unreasonable inferences, or inferences not based on facts pled in the case. *College Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 64 (D.D.C. 2006) (rejecting unreasonable inferences and granting dismissal). Plaintiff did not and cannot allege that IBM intentionally engaged in any unlawful conduct aimed at Plaintiff. The Complaint therefore must be dismissed with prejudice.

## II. THE DOCTRINE OF VICARIOUS LIABILITY DOES NOT SAVE PLAINTIFF'S COMPLAINT.

In its opening brief, IBM demonstrated that Plaintiff has not made and cannot make any allegation that any IBM employee acted within the scope of his or her employment at IBM and for the benefit of IBM in attempting to access Plaintiff's e-mail server. Mem. at 7-10. Stated differently, Plaintiff's failure to allege that these acts were a "conscious objective" of IBM precludes liability under the doctrine of respondeat superior.

In response, Plaintiff argues that it is premature to dismiss the Complaint because, after discovery, they may be able to articulate a theory -- not currently found anywhere in the Complaint -- on which to hold IBM vicariously liable for the conduct of one of its employees. Opp. at 9. But Plaintiff makes no attempt to explain how any of those hypothetical theories

could ever be applicable here.  For example, Plaintiff claims that "ratification" might apply if the hacker was purporting to act on IBM's account (Opp. at 9-10), but alleges no facts -- and, in particular, no motive -- that could possibly explain why IBM would want any employee to hack into Plaintiff's server.  Likewise, Plaintiff argues that "corporations are criminally liable for the crimes of their senior officers, 'particularly when the corporation benefits from the officers' offensive conduct'" (Opp. at 10 (internal citations omitted)), but fails to allege any facts from which the Court could infer either the involvement of a senior officer or any conceivable benefit to IBM.  Indeed, it is the inability to identify any possible benefit that IBM could derive from the alleged hacking that distinguishes all of the other cases cited by Plaintiff and that ultimately is fatal to Plaintiff's argument.

For example, Plaintiff claims that other courts have found corporate defendants liable "for this type of activity regardless of who turned on the machine, wrote the program or pressed the enter button on the keyboard."  Opp. at 9, n.7.  But the cases it cites all involve intentional conduct that was directed or approved by the corporate defendant in order to gain an unfair business advantage at the expense of a competitor.  *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 932 (9th Cir. 2004) (corporate defendant hacked into a competitor's website to examine source code, search features, etc. and hired one of the competitor's employees who then misappropriated customer lists); *E.F. Cultural Travel v. Explorica, Inc.*, 274 F.3d 577, 579 (1st Cir. 2001) (corporate defendant hired a third party internet consultant to create a software program that would extract prices from a competitor's website so defendant could undercut competitor's prices); *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188,

1192-93 (E.D. Wash. 2003) (corporate defendant hired employees from competitor who misappropriated trade secrets and confidential information).[9]

Plaintiff can derive no support from the court's decision in *Physicians Interactive* (Opp. at 11-12), a case involving a corporate defendant whose IT manager dispatched "electronic robots" to steal a competitor's customer list, computer code, and confidential data. 2003 WL 23018270 at *1. Unlike here, the corporate defendant was the registered owner and exclusive user of the IP address associated with one of the attacks, and it was a business competitor of the victim whose customer data was stolen.[10] *Id*. at *2. That the plaintiff in *Physicians Interactive*, on these allegations, was found to have adequately asserted both intentional conduct and a theory of respondeat superior should be of little comfort to Plaintiff here, who has not come close to pleading such a claim.

Plaintiff is wrong in arguing that "all" of the cases cited by IBM were summary judgment decisions where discovery had been completed. Opp. at 11. Plaintiff ignores the many authorities deciding respondeat superior and vicarious liability claims on motions to dismiss. Mem. at 7-8 (citing *Keys v. Washington Metro. Area Transit Auth*., 408 F. Supp. 2d 1, 4 (D.D.C. 2005) (motion to dismiss granted); *Johnson v. United States*, No. 87-0300, 1987 WL 15690, at *1-2 (D.D.C. July 31, 1987) (motion to dismiss granted); *Graves v. Tubb*, 281 F. Supp. 2d 886,

---

[9] Plaintiff's citation to *Peridyne Tech. Solutions, LLC v. Matheson Fast Freight, Inc*., 117 F. Supp. 2d 1366 (N.D.Ga. 2000), is peculiar. *Peridyne* involved motions to dismiss on jurisdictional and venue grounds, not for failure to state a claim. While the court indicated *in its background discussion* that the acts in question had occurred within the scope of the employment relationship (*Id*. at 1369), this question was not before the court, and the fact that jurisdictional and venue motions were denied does not make it a decision holding a corporate defendant "liable" at all. Opp. at 9, n.7.

[10] The other IP address was registered to Cox Communications, an Internet Service Provider, but assigned to the home computer of the IT manager for the corporate defendant. *Id*. at *2. Unlike Plaintiff here, the *Physicians Interactive* plaintiffs (appropriately) did not attempt to sue Cox Communications for intentional wrongdoing based on its registration of the IP address.

891-92 (N.D. Miss. 2003) (motion to dismiss granted)); Mem. at 10, n. 5 (citing *Booker v. GTE.net*, 350 F.3d 515 (6th Cir. 2003) (affirming order of dismissal)).

In fact, courts routinely grant employers' motions to dismiss where plaintiffs fail to plead how the conduct at issue falls within a job-related task, or how the employer might benefit from the conduct (as opposed to the employee personally).  *See*, *e.g.*, *Tasso v. Platinum Guild Int'l*, No. 94 CIV. 8288, 1997 WL 16066 (S.D.N.Y. Jan. 16, 1997) (granting motion to dismiss for lack of allegations regarding scope of employment and furtherance of employer's business) (attached as Ex. G); *Shaup v. Jack D's, Inc.*, No. Civ.A 03-5570, 2004 WL 1837030, at *2 (dismissing allegations that "fail to support a reasonable inference that the employee was acting in furtherance of his employer's business") (attached as Ex. H).[11]

The court's decision to grant a motion to dismiss a CFAA claim against a corporate defendant in *Role Models America, Inc. v. Jones*, 305 F. Supp. 2d 564 (D.Md. 2004), is a good example of these principles at work at the Rule 12(b)(6) stage.  In *Role Models*, a university was sued under the CFAA because one of plaintiff's employees had provided plaintiff's confidential information to the university in connection with his dissertation.  *Id.* at 565-66.  The *Role Models* court found the plaintiff's allegations against the university of "intentional access" to a protected

---

[11] Plaintiff also attempts to distinguish *Doe v. Dartmouth-Hitchcock Med. Ctr.*, No. CIV00-100-M, 2001 WL 873063 (D.N.H. July 19, 2001), a case in which a medical practice group was found on summary judgment not to be liable under the CFAA for the unauthorized use of electronic medical records by one of its employees.  While the case was resolved at a later stage in the litigation, the principle on which it was decided -- i.e., that an employer is not liable for the CFAA violations of its employee unless they were committed for its benefit or under its direction -- is nevertheless decisive here.   The two cases cited by Plaintiff have not criticized *Doe* or cast doubt on its validity, but have simply distinguished it.  Opp. at 12.  In each case, the corporate defendant knowingly and purposefully engaged in the wrongful conduct in ways that rendered it a "violator" under the language of the statute.  *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 U.S.Dist.LEXIS 21348, at *8-9, *22 (N.D.Ill. Sept. 27, 2005) (defendant directed plaintiff's employee to access proprietary information on plaintiff's computer before beginning employment with defendant); *Nexans Wires S.A. v. Sark-USA, Inc*., 319 F. Supp. 2d 468, 472 (S.D.N.Y. 2004) (defendant directed individuals to steal plaintiff's proprietary information from a third party).  In fact, IBM cited the *Nexans Wires* decision to the Court in its opening brief with a "*Cf*." citator to give the Court an example of a case where, unlike here, intentional conduct had been pled properly.  Mem. at 9.

computer insufficient as a matter of law and dismissed the CFAA claim under Rule 12(b)(6). Significantly, the court remarked that:

> There is no claim that [the university] directed or even encouraged [the individual] to access [plaintiff's] computers, nor any factual allegations supporting an agency relationship. Absent some indication that [the individual] acted at [the university's] behest, it is impossible to hold [the university] liable for CFAA violations allegedly committed by [the individual].

*Id.* at 568. Because there are no allegations in Plaintiff's complaint suggesting that John Doe acted at IBM's behest or for IBM's benefit, Plaintiff's allegations are similarly insufficient as a matter of law to invoke the doctrine of respondeat superior.

### III. PLAINTIFF IS NOT ENTITLED TO AMEND THE COMPLAINT OR TO OBTAIN EXPEDITED DISCOVERY.

In its opposition brief, Plaintiff argues that its complaint cannot be dismissed until it has had an opportunity to conduct discovery to determine whether it has any basis to sue IBM. Opp. at 1, 2, 6, 11, 13, 16. It concedes that it does not know the identity of the alleged attacker (Opp. at 5), concedes that discovery may well exonerate IBM in this matter (Opp. at 6, 12), and concedes that the case should be dropped if it turns out that IBM had no access to the customer server allegedly used in the purported attack (Opp. at 8). In all of this, Plaintiff ignores the fact that Rule 11 requires a plaintiff to have a good faith basis to file a lawsuit -- in this case, a good faith basis to assert intentional misconduct by IBM -- *before* it goes to Court. *Weil v. Markowitz*, 108 F.R.D. 113, 116 (D.D.C. 1985) ("Counsel should not be allowed to file a complaint first and thereafter endeavor to develop a cause of action"); *City of Yonkers v. Otis Elevator Co.*, 106 F.R.D. 524, 525-26 (S.D.N.Y. 1985) (imposing sanctions and rejecting plaintiffs' argument that they needed discovery to ascertain whether their claim was well founded).

Here, Plaintiff has made no effort to allege intentional wrongdoing by IBM, and its contention that an IBM employee may be involved is made only "on information and belief" --

and then only based on unreasonable inferences drawn from mere registration of an IP address. *Gallagher v. Kopera*, 789 F. Supp. 277, 278 (N.D. Ill. 1992) (allegations made "on information and belief" are particularly suspect under Rule 11). Plaintiff has not identified any facts which it could in good faith add to the complaint to cure these deficiencies. Plaintiff's inability to articulate any conceivable motive for IBM to attack its e-mail server makes it implausible that it would ever be able to assert an intentional tort claim against IBM, regardless of the identity of the alleged attacker. There are alternative means available to Plaintiff to obtain targeted third party discovery from IBM if IBM has any information that would assist it in determining the identity of such an individual. But none of those alternatives justify delaying the dismissal of this frivolous action.

      The cases cited by Plaintiff provide no support for its position that discovery should be granted before the motion to dismiss is decided. Opp. at 13-14. Two decisions involved Rule 12(b)(1) motions challenging jurisdiction, and jurisdictional discovery (not merits discovery) was permitted to resolve these preliminary issues. *Artis v. Greenspan*, 223 F. Supp. 2d 149, 155 (D.D.C. 2002); *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, No. 96-315, 1997 U.S.Dist.LEXIS 12622, at *13-14 (D.D.C. Aug. 18, 1997). A third decision, *Alvis Coatings*, permitted expedited discovery against third parties -- including two Internet Service Providers -- so that the plaintiff there could identify the persons who had been sued only as "John Doe Defendants." 2004 WL 2904405 at *1. In fact, the procedure used in *Alvis Coatings* is precisely what Plaintiff should have used here instead of filing a meritless claim against IBM as a pretext for demanding discovery about the identity of the unknown hacker.

In any event, Plaintiff has not established any justification for the "expedited discovery it seeks."[12] Plaintiff does not even mention, much less attempt to meet, the standards articulated by courts in this Circuit for expedited discovery.[13] Plaintiff has alleged a single unsuccessful attempt to access its e-mail server that supposedly occurred more than seven months ago. It alleges no facts suggesting any continuing danger of future attacks, much less irreparable harm. It has not filed a motion for, nor could it possibly demonstrate a need for, a preliminary injunction or temporary restraining order. It does not assert any reason for needing "expedited" discovery other than the desire to identify the alleged hacker who seven months ago allegedly tried but failed to access its server.

Moreover, the discovery Plaintiff demands is far from "limited." Plaintiff's requests seek confidential customer and employee information that has only the most speculative and tenuous connection to Plaintiff's claims. Plaintiff seeks no less than ten broad categories of documents and electronic information from IBM, including, *inter alia*, work records for all employees, managers and contract workers at the Durham facility, numerous categories of computer logs for 82 different IP addresses (only one of which is tied to any alleged "attack" on Plaintiff's own systems), access to the hard drives for all servers associated with three IP addresses, and

---

[12] While Plaintiff's opposition brief is also styled "And Cross Motion for Expedited Discovery," Plaintiff has not filed a formal motion requesting any such relief, has not submitted any proposed discovery demands, and has not even submitted a proposed order encompassing this relief. IBM's response to Plaintiff's "expedited discovery" arguments should not be deemed a concession that any legitimate "cross motion" is even before the Court.

[13] *See Sinclair Nat'l Bank v. Office of the Comptroller of the Currency*, No. 00-2398, 2000 WL 34012862, at *3-4 (D.D.C. Dec. 18, 2000) (motion denied) (citing *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982) and requiring evidence of (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted) (attached as Ex. I); *see also Disability Rights Council of Greater Washington v. Washington Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006) (denying motion under both *Notaro* test and "reasonableness" test, which looks at (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made).

documents reflecting the discharge of *any* IBM employee or contractor for *an*y reason during a six month period.  Opp. at 14-15.  These unfocused demands would impose significant burdens on IBM, and would jeopardize the interests of customers and employees without any commensurate benefit to the resolution of the litigation.[14]

Plaintiff has failed to establish any urgency justifying expedited discovery.  If Plaintiff's claims survive dismissal, there will be plenty of time to conduct discovery within the time periods proscribed by the Federal Rules and the expectations of the Court, with no resulting prejudice to Plaintiff.  Putting it bluntly, Plaintiff's motion "appear[s] to be a thinly veiled attempt to circumvent the normal litigation process."  *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 143 (D.D.C. 2005) (motion denied).  Given Plaintiff's failure to state a claim for relief and the lack of any reasonable basis for bringing these claims in the first place, the Court should not reward Plaintiff by granting it expedited discovery.

## CONCLUSION

Plaintiff likens this case to the getaway driver who disclaims participation in a robbery.  According to Plaintiff's logic, however, a getaway driver's employer, who only authorized the driver to use the car to deliver pizzas, would also be guilty of the crime.  (And so would the fleet owner, who rented the car to the restaurant for use in making pizza deliveries).  Such results make no sense and have no basis in either the operative statutes or the caselaw.  For all of the

---

[14] Plaintiff claims that "IBM has pointedly declined to provide access to the internal material which Plaintiff believes will demonstrate culpability on the part of IBM."  Opp. at 2.  It provided no evidentiary support for this claim and it is false.  In fact, IBM had already agreed to contact each of its customers to whom any of the IP addresses in question have been assigned to attempt to determine whether they still maintain logs for 2005 activity.  This offer was made -- and accepted by Plaintiff -- as a compromise to avoid the need to take these issues to the Court -- a compromise which Plaintiff apparently feels free now to ignore.  Ex. D.  IBM is not, however, willing to permit Plaintiff wholesale access to confidential customer and employee information when Plaintiff cannot articulate any reasonable basis for asserting its relevance.

aforementioned reasons, and because re-pleading would be futile, Plaintiff's complaint should be dismissed with prejudice under Federal Rule 12(b)(6).

Date:   June 30, 2006                                          Respectfully submitted,


      */s/ Mary Ellen Powers*
Mary Ellen Powers (DC Bar #334045)
Geoffrey S. Irwin (DC Bar #465754)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001
(202) 879-3939 (phone)
(202) 626-1700 (fax)

*Counsel for Defendant IBM*